

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2538 | **DATE** | 7/10/2000 |
| **CASE TITLE** | Dorthea Gibbs, et al vs. G.D. Searle Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3 Aug. 00 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Searle's motions for summary judgment (doc. 25,24 and 26) are granted. The motion for summary judgment against Gibbs (doc. 27) is granted in part and denied in part. Gibbs' claims of retaliation following January 1997 remain. The court grants the following motions by plaintiff: motion for leave to file (doc. 41-l), motion to file 56.1 statements in excess (doc. 41-2), motion for an order directing (doc. 65). Plaintiffs' motion to strike (doc. 66) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUL 11 2000,
date docketed

*eaw*
docketing deputy initials

date mailed notice

**Document Number**

73

WAP

courtroom deputy's initials

02:29:00 11:00:00

Date/time received in central Clerk's Office

mailing deputy initials

DOCKETED

JUL 1 2000

FILED

JUL 1 0 2000

Judge Harry D. Leinenweber
U.S. District Court

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DORTHEA GIBBS, JOYCE BLOUNT,
LESLIE POMPEY-WRIGHT, ROSE
DANIELS,

              Plaintiffs,

    v.

G.D. SEARLE CO., A Subsidiary
of MONSANTO,

              Defendant.

Case No. 98 C 2538

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Before the court is defendant G.D. Searle & Co.'s ("Searle's") four motions for summary judgment. The four plaintiffs in this case, Dorothea E. Gibbs ("Gibbs"), Joyce Blount ("Blount"), Leslie Pompey-Wright ("Pompey-Wright") and Rose Daniels ("Daniels") allege that Searle discriminated against them on the basis of race and that Searle retaliated against them.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court

construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The standard governing summary judgment is clear: '[I]f no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment . . . then summary judgment must be granted.'" *Oates v. Discovery Zone*, 116 F.3d 1161, 1175 (7th Cir. 1997) (citing *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 660 (7th Cir. 1991)). The plaintiff has to produce more than a scintilla of evidence in support of her position. *See Anderson*, 477 U.S. at 252. The court addresses the motions for summary judgment in turn.

## MOTION FOR SUMMARY JUDGMENT AGAINST DOROTHEA GIBBS

### BACKGROUND

Gibbs, an African-American, was employed by Searle for 16 years. She was hired in 1981.

Significant to the discussion of Gibbs' background is that a redesign took place at Searle during her employ. The redesign consisted of outside consultants recommending changes in organizational structure, processes and computer systems because Searle was interested in shortening the drug development process and getting new drugs to the market faster.

Before the redesign was implemented in the fall of 1996, the Clinical Data Management Department was part of Statistics and

Clinical Data Management ("SCDM"). SCDM included Statistics, Programming, Clinical Data Management and the Medical Documentation Center. In March 1995, Donna Lucas-Mudd ("Lucas-Mudd") became the Director of Clinical Management; she reported to Dr. Tad Archambault ("Archambault"), Senior Director of SCDM. In March 1995, the following employees with "supervisor" titles in the Clinical Data Management group reported to Lucas-Mudd: plaintiff Daniels, Holly Friedman (white), Gibbs, Mark Gruszka ("Gruszka") (white), Janice Kuse-Hamilton (Asian-American), and Karen Lange (white). There were approximately 30 employees in Clinical Data Management at that time.

In 1996, Gibbs expressed concern that she had not received a promotion and upgrade as promised by her supervisor, Lucas-Mudd. Gibbs was Supervisor of Computer Graphics & Design in the Clinical Data Department. According to Gibbs, Lucas-Mudd told her that she wanted to upgrade Gibbs because she did not feel that supervisors should be at the same grade level as data monitors. Pl. 12N ¶ 3, Gibbs Tr. at 133-34.

Lucas-Mudd instructed plaintiff Pompey-Wright to prepare revised job descriptions for herself and Lisa Eck ("Eck") to reflect the work that they were doing. Lucas-Mudd also worked with Friedman and Gibbs to get their job descriptions revised and positions re-evaluated. The parties dispute whether Lucas-Mudd had the authority to change an employee's position on her own. Sheryl Jacobs ("Jacobs") and Kuse-Hamilton received promotions in November

- 3 -

1995. Kuse-Hamilton became Manager, Clinical Data Management and Jacobs became Supervisor, Clinical Systems Administration. Two employees within Clinical Data Management were also promoted in November 1995: Julie Ferris and Richard Moore. However, neither promotion involved a reevaluation. Def. 56.1 (a)(Pompey-Wright) ¶ 42.

On January 15, 1996, Lucas-Mudd sent an e-mail to Gibbs, Friedman, Lange and Pompey-Wright stating that she needed to receive their position evaluation forms for the proposed job reevaluating. The forms were to be kept by Archambault's secretary until March 1, at which time "Tad will have a quick review and then pass them to Conrad who will pass them to compensation." Def. 56.1(a)(Gibbs) App. Tab 22. Lucas-Mudd did not sign the position evaluation forms nor did she sign the position descriptions that were given to Archambault's secretary. She had resigned and left the company by the time that the paperwork was delivered.

In March or April 1996, Archambault told Gibbs that the reevaluating was on hold because of the redesign. In March 1996, Kuse-Hamilton was appointed to the position of Acting Head of Clinical Data Management, replacing Lucas-Mudd. As Acting Head of Clinical Data Management, Kuse-Hamilton had a greatly increased workload. Archambault gave Kuse-Hamilton the paperwork submitted by Friedman, Pompey-Wright, Eck and Gibbs, but Kuse-Hamilton did not act on it. Archambault resigned in May 1996 and Dr. Ed Swabb

("Swabb"), Executive Director of SCDM, retained a consultant, Shaghig Palanjian ("Palanjian") to assume Archambault's former responsibility for SCDM. Def. 56.1(a)(Pompey-Wright) ¶¶ 61, 62.

According to Searle, during the months of December through March, it typically freezes upgrades in order to process annual evaluations and raises. However, Lucas-Mudd informed Pompey-Wright that there was no freeze on upgrades in late 1995-1996. Pompey-Wright Tr. at 197, 199, Pl. Resp. to Def. 56.1(a)(Gibbs) ¶ 31.

Gibbs filed her first series of discrimination charges in May 1996, alleging race discrimination based on Searle's failure to upgrade her. She then amended the charge to include the incidents surrounding the Validation Specialist Position, discussed *infra*. Pl. 56.1(b) App., Tab 31, 32. Gibbs alleges that between May 1996 and August 1996, when she was promoted, other retaliatory and/or discriminatory incidents occurred.

As a result of Searle's redesign, three new franchises were created in Clinical Data Management: Arthritis, Cardiovascular, and Global New Business. Gibbs' position no longer existed. In August 1996, Gibbs alleges that Swabb informed her that she would be promoted to the position of manager. Gibbs expressed concern to Swabb that she was being "set up for failure." Def. 56.1(a)(Gibbs) ¶¶ 93, 94, 95. On September 16, 1996, Gibbs was promoted to Assistant Manager of the Global New Business data monitors.

Kuse-Hamilton was assigned to mentor Gibbs in Gibbs' new position; however, Kuse-Hamilton did not consistently assist Gibbs.

Nevertheless, Kuse-Hamilton did arrange for Friedman to meet with Gibbs about the DLB Recorder. Gibbs' responsibilities as Assistant Manager were significantly different from when she was Supervisor of Computer Graphics and Design.

Between November 1996 and February 1997, Elsa Barin ("Barin") became Acting Head of Clinical Data Management and Gibbs' immediate supervisor. At the end of 1996, Gibbs alleges that she received the most negative appraisal she had received since she began her employ with Searle. Gibbs filed a critical response to her appraisal. Kuse-Hamilton prepared a written performance feedback in January 1997 in connection with Gibbs' 1996 evaluation.

In January 1997, the Clinical Data Management Department, in which Gibbs was working, was transferred from the Clinical Research Department to the Technical Support & Administration Department, under the direction of Arni Miller ("Miller"). In early 1997, Jacobs was appointed to be Leader of Data Management, replacing Barin. Jacobs became responsible for all aspects of the Clinical Data Management Department. All of the employees responsible for database administration and forms design activities were assigned to Jacobs, including Gibbs.

According to Deanne Zirpoli ("Zirpoli"), Jacobs stated that she wanted to terminate six employees and that she wanted a training program devised to create the documentation to "legally" be able to terminate the employees. Zirpoli worked at Searle from

November 1996 until October 1997 in the Clinical Research Department.

Zirpoli also testified that Jacobs provided a list of employees that she wanted to terminate. The list, according to Zirpoli, consisted of all minorities: five African-Americans and one Asian-American, Kuse-Hamilton. Three of the four African-Americans on the list, Gibbs, Blount and Daniels, had already filed charges of race discrimination. Zirpoli was concerned that the creation of the training program was race-related. Zirpoli Aff. ¶ 2. According to Zirpoli, Jacobs stated that she was particularly interested in firing Gibbs because Gibbs was a "troublemaker," a "ringleader," and trying to persuade all of the African-Americans to file lawsuits against the company. Zirpoli testified that Emmett Woods ("Woods"), Director/Clinical R&D, advised her to stay away from Gibbs because he didn't want anyone under him to be involved in a lawsuit. Zirpoli Dep. at 57.

In March 1997, Gibbs' title was changed from Assistant Manager to Group Leader; however, her duties did not change. Also, in March 1997, Gibbs requested an enclosed office. She believed that it was important to her work, and she noted that secretaries had offices and that there were vacant offices. According to Gibbs, Miller told her that she did not have a high enough pay grade and that she was not "ready." Gibbs believes that this was part of a total environment created in retaliation to her discrimination

charges. Searle counters that no vacant offices existed. Reply at 2, n. 3, see Pl. Resp. to Def. 56.1(a)(Gibbs) ¶138.

In 1997, Searle decided to institute an Intensive Development Program to train all of its Data Management employees; Jacobs was put in charge of the training program. Zirpoli had no role in developing the training program. The program was mandatory for all Data Management employees. At the conclusion of Phase I of the Intensive Development Program, Jacobs rated Gibbs' performance as poor and needing improvement. Gibbs' performance was rated the lowest of the three Group Leaders. Third parties to the Intensive Development Program also evaluated Gibbs. Searle and Gibbs dispute the tenor of the third-party evaluations as to Gibbs. On the one hand, Searle contends that some third-party appraisals indicated that Gibbs was having little or no contact with her third-party counterparts. Gibbs, on the other hand, states that one appraiser gave Gibbs the second highest rating, and another gave her the highest rating.

Upon conclusion of the Intensive Development Program, Zirpoli alleges that Jacobs came to her with employee evaluations and indicated that she had not gotten the results that she wanted. Gibbs argues that Jacobs was looking for results which would provide her with enough documentation to fire the six listed employees. Zirpoli Tr. at 225-26. Jacobs contests this. Jacobs Decl. ¶ 17.

In July 1997, Gibbs filed a charge with the Illinois Department of Human Rights ("IDHR"), alleging race discrimination and retaliation in connection with her Assistant Manager designation, her grade level, her January, May, and June 1997 performance appraisals and her office assignment.

Gibbs was given a second Direct Evaluation by Jacobs as part of the Intensive Development Program. In November 1997, Gibbs was placed on a Performance Improvement Plan. Gibbs complained that the Plan constituted retaliation for her earlier charges. According to Jacobs, Gibbs was performing poorly on the Plan. Gibbs contends that Jacobs' assessment of her performance was motivated by animus.

In December 1997, Gibbs met with Dave Kornhauser ("Kornhauser"), a Human Resources Representative. Gibbs' notes from the meeting state, "Dave believes that because I feel I'm being retaliated against I can't do my work." Gibbs argues that Kornhauser was attributing Gibbs' difficulties to her discrimination allegations and that he encouraged her to drop her charges.

In January 1998, Jacobs gave Gibbs her annual appraisal. Searle contends that Gibbs was deficient; Gibbs contends that any criticism of her performance is immaterial in light of the racial animus of Jacobs. Gibbs amended her January 1998 Charge in March 1998, alleging race discrimination and retaliation in connection with her termination. Searle terminated Gibbs on February 9, 1998

because, as Searle alleges, Gibbs failed to develop the technical skills required for her new job.

## DISCUSSION - GIBBS

Gibbs alleges that she presents both indirect and direct evidence of retaliation and race discrimination.

In order to make a case for unlawful employment activity through indirect evidence, Gibbs employs the burden-shifting method of proof set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). The first step is for the plaintiff to present a *prima facie* case of discrimination. There are four prongs to the *prima facie* case: (1) the plaintiff is a member of a protected class; (2) she was performing her job according to the employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated, non-protected employees were treated more favorably. In the second step, the employer must articulate a legitimate, nondiscriminatory reason for its actions. In the third step, the burden shifts back to the plaintiff to establish that the employer's stated reason is a pretext for discrimination or retaliation. *See Stalter v. Walmart Stores, Inc.*, 195 F.3d 285, 288 (7th Cir. 1999).

In order to establish a *prima facie* case of retaliation, Gibbs must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) that there was a causal link between the protected expression and the adverse

action.  *Mathur v. Board of Trustees*, 207 F.3d 938, 941 (7th Cir. 2000).  The court addresses each of Gibbs' claims as to whether they make out a *prima facie* case of discrimination and/or retaliation.

Gibbs alleges, similar to Pompey-Wright, that she and other African-Americans were not promoted in late 1995 or early 1996 but that other similarly situated persons, who are not in the protected class, were promoted. Gibbs does not allege that the failure-to-promote was retaliatory; consequently, the court considers whether Gibbs has alleged a claim of discrimination.  *See* May 1996 Charge, Def. 56.1(a)(Gibbs) App. Tab 26.  Furthermore, Gibbs does not allege that she has direct evidence of Searle's racial discrimination with regards to this claim; thus, the court analyzes Gibbs' allegations according to the *McDonnell Douglas* burden-shifting approach.

Searle argues that Gibbs has not established a *prima facie* case or, alternatively, she cannot rebut its legitimate business reasons.  Specifically, Searle argues that (1) Gibbs has not shown that other similarly situated employees were upgraded, which is prong four of the *McDonnell-Douglas* test and (2) if Gibbs has established a *prima facie* case, she has not demonstrated pretext. *McDonnell-Douglas*, 411 U.S. at 802.

Gibbs has failed to establish that Searle treated similarly situated white employees differently.  In the Complaint, Gibbs alleges that in January 1996 she submitted a position evaluation

seeking to have her position re-evaluated or upgraded. Compl. ¶ 12. Gibbs then alleges that "several" non African-American employees within the SCDM Department were promoted between December 1995 and May 1996 and that she was not. *Id.* ¶ 13. However, Gibbs was working specifically within the Clinical Data Management Department. The SCDM Department comprises not only Clinical Data Management but also Statistics, Programming, and the Medical Documentation Center. Def. 56.1(a)(Gibbs) ¶ 10. Gibbs admits that no employees with the Clinical Data Management group were promoted from December 1995 until the redesign of the SCDM was announced in August 1996. Pl. Resp. to Def. 56.1(a)(Gibbs) ¶ 53. Although Gibbs points out that Kuse-Hamilton and Jacobs were promoted in November 1995, this is not the relevant time period as alleged by Gibbs. *See* Compl. ¶ 13, Pl. 56.1(b) App. Tab 32.

Gibbs "must come forward with specific evidence showing that she was similarly situated to Caucasian employees" who were promoted. *Pafford v. Herman*, 148 F.3d 658, 668 (7th Cir. 1998). The plaintiffs' argue that they should be compared to the entire SCDM Department because the redesign involved all of SCDM. However, Swabb testified, and the plaintiffs do not rebut, that not only did the different departments within the SCDM have different responsibilities but that Palanjian

> advised against promoting people, especially filling a
> vacancy until she completed her assessment. And she was
> specifically mindful of the situation that *[sic.]* the
> Data Management because of the need for a lot of changes
> in Data Management organization processes . . . [T]he

> Statistics and Programming parts and the Medical
> Documentation Center were separate . . . really separate
> subdepartments within SCDM, different types of expertise
> and were not so much the issue as the Data Management.

Swabb Dep. at 54-55. In *Watson v. MCI Communications Corp.*, No. 94
C 3082, 1997 WL 85171 *2 (N.D. Ill. Feb. 24, 1997), a failure-to-
promote case, the court granted summary judgment because the
plaintiff did not provide proof that he was similarly situated to
the employees that he wanted to compare himself to. The court
noted that similarity of situation is important because even though
the *McDonnell Douglas* framework is flexible, "[t]o raise an
inference of discrimination, the fundamental requirement is that a
Title VII plaintiff show she was treated differently than *[sic.]*
similarly situated employees." *Id.* (citing *Cherry v. American Tel.
and Tel. Co.*, 47 F.3d 225, 228 (7th Cir. 1995)).

In this case, the court cannot compare Gibbs' situation to the
entire SCDM Department without evidence that employees in other
departments were similarly situated to Gibbs. *See Pafford* 148 F.3d
at 668. "We do not sit as a superpersonnel department that
reexamines an entity's business decision and reviews the propriety
of the decision." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th
Cir. 2000). In this case, this standard applies to how Searle
organizes itself. Therefore, Gibbs has failed to establish a *prima
facie* case of discrimination on the basis of failure-to-promote.

Next, Searle argues that appointing Gibbs to Assistant Manager
in September 1996 was neither discriminatory nor retaliatory.

Gibbs raises two claims as to this incident. First, Gibbs alleges that she was "set up for failure" because the position required technical skills that she did not have. Pl. Resp. at 45. Second, Gibbs alleges that Searle discriminated and retaliated against her by changing her title from Manager to Assistant Manager before her promotion became effective because the other department heads were made managers and paid at a Grade 9. Compl. ¶¶ 17, 18. Although seemingly logically inconsistent, Gibbs is alleging that she was given a job that she could not perform yet paid less for it than her counterparts.

However, Gibbs claims both fail to survive summary judgment. First, Gibbs' "set up for failure" claim was not alleged in the Complaint, nor is it alleged in her discrimination charges to the IDHR. *See* Def. 56.1(a)(Gibbs) App. Tabs 26, 27, 29, 30, 31. A complaint may not be amended by arguments made in a brief in opposition to a motion for summary judgment. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997).

As to the other claim that Searle discriminated in its titling and pay grade for the fall 1996 promotions, Gibbs has not established, sufficient to overcome summary judgment, that similarly situated employees were treated differently. In paragraph 17 of the Complaint, Gibbs compares herself to Kuse-Hamilton, who is the most similarly situated to her. Kuse-Hamilton held the most comparable position because when the SCDM Department was redesigned in August 1996, the CDM was divided into three

groups.  Gibbs supervised the Global New Business Group and Kuse-Hamilton supervised the Arthritis Group.

However, in addition to the Arthritis Group, Kuse-Hamilton continued to act as head of all CDM activities in all three groups. Kuse-Hamilton, who was promoted to manager and continued her 9009 pay grade, had greater technical expertise and management experience than Gibbs.  Pl. Resp. to Def. 56.1(a)(Gibbs) ¶ 91. Gibbs acknowledged that she needed to develop certain skills to successfully perform in the Assistant Manager position, and Kuse-Hamilton already possessed some of those skills. *Id.* ¶ 92. "Although an issue whether two employees are similarly situated is normally fact specific," in this case, Gibbs admits that Kuse-Hamilton had both responsibilities and skills that she did not. *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 (7th Cir. 1985).

Next, Gibbs alleges that in both January and February 1997, she requested an office equal to the other group leaders and that she was told she would get an office when management felt that she was "ready."  IDHR Charge, 7/97, Def. 56.1(a)(Gibbs) App. Tab 26. Over the course of at least five responsive pleadings, exhibits, affidavits and various declarations, the parties dispute back and forth as to whether there was a vacant office available and if a vacant office was available, whether the Clinical Data Management Department was entitled to use it.

According to the Seventh Circuit, an employment action or inaction that has "little or no effect on an employee's job" does

- 15 -

not constitute retaliation. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). The action must have "some tangible job consequence." *Id.*

Gibbs contends that not having an office was adverse to the performance of her job because she was not able to attend to personal matters nor maintain certain levels of confidentiality for her direct charges. Pl. Resp. at 47. She does not allege why confidentiality was important or what effect this had on her performance or job.

"While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). In *Place v. Abbott Laboratories*, Nos. 99-2418, 99-2971, 2000 WL 706035, *6 (7th Cir. June 1, 2000) the Seventh Circuit reversed the district court's entry of the jury's judgment for the employee, in part, because the employee's claims of "losing her telephone and cubicle -- are too trivial to amount to an adverse employment action." Because Gibbs has not shown why the lack of an office was an adverse employment action by Searle, summary judgment is granted as to the office assignment claim.

The court next addresses Gibbs' allegedly direct evidence that a Searle employee, who directly supervised her, retaliated against her because she filed discrimination charges. "[B]y definition, direct evidence, if believed by the trier of fact, will prove the

particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). In *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997), the Seventh Circuit held that "[e]vidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination."

Gibbs' remaining claims are covered by her allegations that Jacobs acted in retaliation against her because Zirpoli alleges that Jacobs first specifically targeted Gibbs in January 1997, and all of the remaining allegations temporally follow this incident. Gibbs complains that she received unwarranted negative appraisals from Jacobs, especially during the Intensive Development Program and that the results of the Intensive Development Program snowballed into the Performance Improvement Plan, which resulted in Gibbs' termination.

Direct evidence of discriminatory intent "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle* at 569. According to the Civil Rights Act of 1991, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). In

this case, Jacobs, a decision maker, allegedly made derogatory comments about Gibbs' protected activity, *i.e.*, the filing of discrimination claims, and then, at the same meeting, suggested instituting a program in order to terminate her.

Searle argues that Zirpoli's affidavit should be disregarded because it is inconsistent with her deposition testimony. Searle points out that in her deposition, Zirpoli attributed the "ringleader" comment to Woods, not to Jacobs; whereas, in her affidavit, Zirpoli swore that Jacobs called Gibbs a "ringleader."

In *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993), the plaintiff testified during his deposition that he had no recollection as to whether an ADEA notice was posted on the employer's bulletin board. However, more than a year later, the plaintiff filed an affidavit stating that no ADEA notice was posted on the bulletin board. The court said that a "party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject." *Id.*

In this case, because Zirpoli testified that Woods called Gibbs a "ringleader," does not mean that Jacobs did not also make the same comment. Zirpoli testified that "there's so many conversations about Dorothea Gibbs between Emmett and Sheryl and then also later on with Jan, you know, it's hard to remember who said what specifically." Zirpoli Dep. at 75. This is not inconsistent with Zirpoli's later assertion that Jacobs considered

Gibbs a "ringleader." It is "hard to remember" does not mean "I can't or won't remember." In *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999), the court held that "where the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit."

Searle also argues that Gibbs' case defies logic. With regards to Zirpoli's testimony about the rationale behind the training program, Searle contends that, at best, Jacobs' comments reflect the intent to "'weed out poor performers,' a perfectly legitimate objective." Def. Reply at 7. However, it seems that it is Searle's position that defies logic because in its Memorandum of Law in Support of its Motion for Summary Judgment, Searle states, "The whole idea that Searle would conduct a training program for employees it wanted to fire is preposterous." Def. Mem. at 14, n. 6. Searle's argument fails under the weight of its own pleadings.

In fact, Searle states outright: "Searle denies that Zirpoli's testimony is true." *Id.* This statement alone, combined with Jacobs' testimony, which contradicts Zirpoli's also raises an issue of "he said/she said," or in this case, "she said/she said," which is an issue for the jury. Def. Reply Ex. Tab 5, p. 172, *see, e.g.,* Jacobs Dep. at 168-169, *see also, Anderson*, 477 U.S. at 255.

Jan Troeger, who was also purportedly present when Jacobs targeted six employees and Gibbs in particular, was questioned, "At

any time during the spring months of 1997, did Miss Jacobs ever tell you that she wanted to terminate five or six employees in her department?" She responded, "Absolutely not." Def. Reply Ex. Tab 14, p. 60. In *Riemer v. Illinois Dep't. of Transportation*, 148 F.3d 800, 806 (7th Cir.1998), the court noted that it must be "particularly careful in employment discrimination cases to avoid supplanting our view of the credibility of the evidence for that of . . . the jury."

As to the retaliation aspect of these claims, the weight and credibility of Zirpoli's testimony, for example, is a matter for the jury. *See Spiller v. Brady*, 169 F.3d 1064, 1067 (7th Cir. 1999), *Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998). In *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, No. 99-2280, 2000 WL 568330, *3 (7th Cir. May 11, 2000) (brackets added), the court held that when a "reasonable jury could find that after and because [the employee] filed the claim, [the employer] was 'laying' for her, biding its time to create a space between the date of the claim and the date of the discharge, and in the interval gathering pretextual evidence of misconduct to provide a figleaf for its retaliatory action," then summary judgment should be denied. Such is the case here.

As to the claim of racial discrimination, however, there is no direct evidence that Searle discriminated against Gibbs on the basis of race. *See Randle* 876 F.2d at 569. Zirpoli does not testify that the subject of race was raised, in fact, she admits

that she was the one who "was immediately concerned that this was race related." Zirpoli Aff. ¶ 2. Therefore, the court analyzes Gibbs' racial discrimination claim with regards to her negative performance appraisals following January 1997, the Intensive Development Program, the Performance Improvement Plan, and her termination under the burden-shifting framework. The first issue is whether Gibbs has made out a *prima facie* case. *Stalter*, 195 F.3d at 288.

Gibbs has not established a *prima facie* case; similarly situated employees were not treated differently. In response to every documented performance deficiency, Gibbs responds,

> Deny on the basis that since Dorothea Gibbs was targeted
> for termination by Searle/Monsanto at the onset of the
> training program, any alleged criticisms or deficiencies
> in performance after that time are tainted and lack
> probative value. As a result of the direct animus
> articulated by Jacobs and Troeger these alleged facts are
> not "material" to the issue of Gibbs' performance and
> should not be considered in support of Defendant's
> Motion.

Pl. Resp. to Def. 56.1(a)(Gibbs) ¶ 157. However, this response does not mask the fact that there were five other names enumerated by Jacobs. *See* Jacobs Dec. ¶ 15. One of the six, Daniels, who is a plaintiff in this suit, still had her job with Searle as of the filing of these motions. Kuse-Hamilton was also on the list and she also continues to work at Searle. If other non-African-American employees were treated similarly and an African-American employee, Daniels, was not terminated, Gibbs has not made out a *prima facie* case under the indirect method.

Therefore, for the foregoing reasons, the motion for summary judgment as to Gibbs is denied in part and granted in part. The retaliation claims which succeed January 1997 survive.

## MOTION FOR SUMMARY JUDGMENT AGAINST JOYCE BLOUNT

### BACKGROUND

Blount began to work for Searle on August 31, 1970. Kuse-Hamilton became Blount's supervisor on November 16, 1995. Blount was working as a Data Monitor. On an uncertain or undisclosed date, Blount talked to Miss Olivia in Project Management and asked Miss Olivia for help on the 006 "study." Sometime between April 1996 and the beginning of October 1996, Blount met with Sylvia Dunnahoo ("Dunnahoo") and Kuse-Hamilton. Both parties agree that during the conversation, Dunnahoo made the following statements to Blount: "You do not know what you are doing"; "I don't know how you're a Senior Data Monitor"; and "You shouldn't be working here." Blount Tr. at 137-140.

On October 4, 1996, Blount, Kuse-Hamilton, and Dunnahoo again met. At the meeting, Dunnahoo complained to Blount that she felt that she was doing all of the work to get the files ready. According to Blount, during the meeting Dunnahoo called Blount "stupid," "a liar," and said that she had no respect for Blount. According to Blount's deposition testimony, Kuse-Hamilton only verbally agreed with Dunnahoo when Dunnahoo said that she did not respect Blount. Blount Dep. at 150. According to Blount, Dunnahoo then mocked Blount in what Blount described as a "black voice."

According to Dunnahoo, she is from Texas and has a Southern accent. Dunnahoo denies that she mocked Blount in an "African American dialect." Dunnahoo Aff. ¶ 5.

On October 5, 1996, Blount sent an e-mail to Swabb, regarding the October 4, meeting. Swabb met with Conrad Muehrcke ("Muehrcke"), a Human Resources Representative, conveying his concern about the incident. Muehrcke then met with Blount about the incident on October 8. Muehrcke and Swabb also met with Dunnahoo on that day. Dunnahoo admitted using the word "stupid." Muehrcke and Swabb told Dunnahoo that the use of the word "stupid" and accusing Blount of lying was discourteous, unprofessional, and unacceptable.

On October 15, 1996, after Kuse-Hamilton had returned from vacation, Swabb met with her. Swabb told Kuse-Hamilton that in failing to correct Dunnahoo's unprofessional behavior on the spot, she appeared to agree in Dunnahoo's disrespect for Blount. Swabb told Kuse-Hamilton that this was not an acceptable management style and that she should have immediately stopped Dunnahoo. Swabb and Kuse-Hamilton developed a six-point action plan that Kuse-Hamilton would undertake to remedy the situation, which included the commitment to "interrupt and counsel against any name calling or other unprofessional behavior on the part of any of your staff as so [sic.] as you become aware of it." Swabb memorialized these meetings in e-mails. Muehrcke concluded that there were no racial overtones to the meeting. When Dunnahoo raised her voice again to

Blount after the October 4 meeting, Kuse-Hamilton reprimanded Dunnahoo.

On October 10, 1996, Blount filed her first charge of discrimination.

Blount alleges that work was unfairly allocated between her and Dunnahoo. Dunnahoo was a new employee in the SCDM Department. Dunnahoo was brought on early in 1996; hence, she worked there less than a year as a data monitor on the same Searle Trial and Report ("STAR") Team with Blount. Dunnahoo and Blount shared studies. In July 1996, Blount had seven studies assigned to her, and four were active. Dunnahoo had four studies. In October 1996, Blount complained to Kuse-Hamilton and Mike Kuss ("Kuss"), her STAR Team leader, that she had no studies. According to Blount, Kuse-Hamilton had given all of Blount's studies to Dunnahoo with the exception of one very low priority study. Blount complained on October 18, 1996. By October 21, 1996, three studies were returned to her. Blount, at her deposition, could not recall the identifying numbers of the studies assigned to her during this time. Blount Dep. 180-185.

On October 23, 1996, a meeting was held with Blount, Kuse-Hamilton and Dunnahoo in which the assignment of studies was revisited, and Blount and Dunnahoo were allocated four studies each. The studies were allocated so as to give both employees new experience. The studies were also allocated based on each woman's past experience. *See* Def. 56.1(a)(Gibbs) ¶¶ 109-116. Blount

admits that after October 23, "[t]he allocation of studies did not provide more experience to one employee over the other." Def. 56.1(a)(Gibbs) ¶ 116. Blount alleged in her discrimination charge that the initial allocation of studies was in retaliation for requesting help on the 006 study from Miss Olivia. Blount Dep. 169-170.

In October 1996, Blount learned about an open Senior Clinical Research Associate ("CRA") position before the position was posted. She approached Kuss, inquiring about the position, and he told her that he needed someone who could write protocols right away. In December 1996, the position was posted. Blount did not apply for the position. The position was listed as a Grade 8. The CRA position required a Bachelor of Science degree. Neither the posting nor the position description required protocol writing experience.

Dunnahoo applied for the position. The interviewers concluded that she was the most qualified person for the position because she had a laboratory and clinical background as well as two Bachelor of Science degrees. Because Dunnahoo was a Grade 4 at the time, the position was lowered to a Grade 6, and posted again.

Blount confronted Kuss with the fact that Dunnahoo had no protocol writing experience and, according to Blount, Kuss told her that "things had changed." Blount Dep. 216-218. Blount again did not apply for the position when it was reposted at a Grade 6. Dunnahoo received the position on March 11, 1997. Blount alleges

that she overheard Kuss tell Dunnahoo that CRO's do not like working with blacks. Blount cannot remember when she overheard this comment. Both Kuss and Dunnahoo deny having this conversation. Blount contends that the promotion of Dunnahoo to CRA was in retaliation for reporting the October 4, 1996 conversation with Dunnahoo and Kuse-Hamilton.

Blount received negative feedback on her work in 1996 from Kuse-Hamilton as well as from Kuss.

In March 1997, Searle implemented the Intensive Development Program to train its employees, which is detailed in Gibbs' background. The program ended in September 1997. Blount's direct supervisor, Lia Pocrnich ("Pocrnich") recognized concerns about Blount's performance. Pocrnich Dep. at 65. Kuss also complained to Pocrnich that Blount was not proactive in dealing with CRO's. Searle documents other complaints about Blount's performance as well. Blount refutes the documentation as "tainted" because Blount was "targeted for termination" in the meeting between Zirpoli and Jacobs. Pl. Resp. to Def. 56.1(a)(Gibbs) ¶ 215.

On June 27, 1997, Blount filed her second charge of discrimination.

On November 12, 1997, Kornhauser, Pocrnich and Jacobs met with Blount and placed her on a 90-day Performance Improvement Plan. Blount was also presented with a severance plan. On November 13, 1997, a fact-finding conference was held before the IDHR.

According to Searle, Blount did not perform well on the Performance Improvement Plan. Blount was terminated on March 1, 1998. Searle contends that Blount was replaced by an Asian-American woman; Blount contends that she was replaced by a white woman.

## **DISCUSSION - BLOUNT**

According to Blount, she was subjected to racial harassment from April 1996 through October 1996. Pl. 56.1(b) App. Tab 58. Blount also alleges that "studies," for which she was responsible, were unfairly allocated between her and a co-worker, Dunnahoo. Blount alleges discrimination arising out of Searle's treatment of the Validation Specialist Position, discussed *infra*. Finally, Blount alleges that she was subjected to discrimination and retaliation surrounding the Intensive Development Plan and the Performance Improvement Plan, leading to her termination.

The court first addresses Blount's claim that she experienced racial harassment from April 1996 through October 1996. Racial harassment "must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 885 (7th Cir. 1998) (internal citations omitted), *see also, Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (comparing standard for sexual harassment with racial harassment: "there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment"). The court is

to "consider 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Additionally, "employers are liable only when they have been negligent either in discovering or remedying the harassment." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997).

Blount alleges that between April and October 1996 she was subjected to racial harassment. First, Blount only points to one specific incident, the October 4 incident, in which race was allegedly was raised. Pl. Resp. at 52, *see Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) ("Isolated and innocuous incidents do not support a finding of sexual harassment.").

Second, Blount's allegations are general; the incident was not so clearly "racist." In *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1381 (7th Cir. 1986), the court held that vague allegations of discrimination without exact dates and without support in the evidence were too nebulous to raise a genuine issue of fact. In this case, Blount alleges no facts and produces no evidence about how any interactions previous to October 4 were harassing or discriminatory and how they altered the conditions of her employment. For example, Blount alleges that "[b]etween January 1996 and August 1996, Kuse-Hamilton had no more concern

- 28 -

about Blount's performance that she did about anyone else's."
Pl. 12(N) ¶ 87. Although not conclusive of a lack of harassment,
Blount cites testimony that neither her performance nor the
appraisals of her performance were suffering during at least part
of this time.

Furthermore, Blount has not shown that Searle was negligent in
responding to the alleged harassment. In arguing that she "was
routinely treated with disrespect and hostility," she cites to her
October 5, 1996 e-mail to Swabb. Pl. Resp. to Def. 56.1(b)(Blount)
¶ 54. Blount does not allege that she complained before or that
the harassment was such that Searle should have discovered it. *See*
Compl. ¶ 36.

The October 4, 1996 incident does not constitute racial
discrimination. First, the only racist comment was allegedly from
Blount's co-worker, Dunnahoo. *See Parkins v. Civil Constructors*,
163 F.3d 1027, 1032 (7th Cir. 1998) (employer's liability for
harassment depends on whether harasser was victim's coworker or
supervisor).

Second, Blount has not evidenced that Searle was negligent in
responding to the October 4 exchange. According to the Seventh
Circuit, "the law does not even require that the employer's actions
prevent harassment, but merely that its response was reasonably
likely to prevent future harassment." *Parkins* 163 F.3d at 1035.

In this case, after the incident, the following actions were
taken by Searle employees to address and remedy the incident:

Swabb met face-to-face with Blount about the incident; Swabb spoke with Muehrcke about the incident; Blount met with Muehrcke; Muehrcke and Swabb met with and reprimanded Dunnahoo; Swabb reprimanded Dunnahoo in an e-mail to be made part of Dunnahoo's record and provided her with a copy of the SCDM Code of Conduct; Swabb and Muehrcke met with Blount again about the meeting they had with Dunnahoo and memorialized the conversation in an e-mail to Blount; Swabb met with Kuse-Hamilton, reprimanded her and provided her with a copy of the SCDM Code of Conduct; Swabb and Kuse-Hamilton developed a six-point action plan that Kuse-Hamilton would undertake to remedy the situation; Swabb memorialized the meeting with Kuse-Hamilton in an e-mail; Swabb held a meeting with all of the data monitors wherein he referenced the October 4 incident and warned that there would be severe consequences if such an incident were repeated; Kuse-Hamilton held a meeting with Blount and Dunnahoo to lay ground rules regarding respect and the SCDM Code of Conduct; and Kuse-Hamilton participated in a management training course within in the following six months. Def. 56.1(a)(Blount) ¶¶ 70-96.

Neither the general allegations of racial harassment, nor the specific incident on October 4 constitute retaliation. In order to establish a *prima facie* case of retaliation, Blount must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by the employer; and (3) that there was

a causal link between the protected expression and the adverse action. *Mathur*, 207 F.3d at 941.

The parties mention that Blount requested help on her studies from "Miss Olivia." Pl. Resp. to Def. 56.1(a)(Blount) ¶ 97. Neither party cites a time nor time frame for this incident; therefore, any harassment is not causally linked to Blount's alleged request for help, even if the request for assistance could be considered "protected speech." *Mathur*, 207 F.3d at 941. Furthermore, both Blount's e-mail to Swabb and her first IDHR charge were in October, after the October 4 exchange. In fact, when Dunnahoo raised her voice to Blount after October 4, Kuse-Hamilton reprimanded her. Kuse-Hamilton Dep. 179-180. Therefore, summary judgment is granted as to the racial harassment and retaliation claim surrounding the allegations between April 1996 through October 1996, including the October 4 incident. *See* Compl. ¶ 36.

Next, Blount claims that Searle discriminated and retaliated against her because within weeks of the October 4 incident almost all of her studies had been taken away from her and reassigned to Dunnahoo. The court finds that Blount has not established that she suffered either a discriminatory or a retaliatory adverse employment action.

In charging that Kuse-Hamilton reassigned "almost all" of her studies, Blount refers to paragraph 57 of the Defendant's 56.1(a) statement. Pl. Resp. at 52. However, paragraph 57 only refers to

one study.  Def. 56.1(a)(Blount) ¶ 57.  In her deposition, albeit two years after the incidents, Blount could not remember which studies were taken away from her.  Blount Dep. at 180-185.  By October 18, 1996, two and a half weeks after the incident, Blount was responsible for the 026, 007, and 008 studies.  Def. 56.1(a) (Blount) App. Tab 40.  Blount complained again that she wanted certain studies that she had been working on, in order to prevent Dunnahoo from taking credit for her work.  Hence, by October 23, both Dunnahoo and Blount had four studies each.  Def. 56.1(a) (Blount) ¶ 108.

In *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000), the court held that an employer had taken prompt remedial action when he investigated the plaintiff's allegations and took action on them within two weeks.  In this case, Blount has not established that she was either discriminated against or retaliated against with regards to the allocation of the workload between her and Dunnahoo.  Summary judgment is granted as to the unfair allocation of the case load claim.

Searle argues that because Blount did not include her claims relating to the Validation Specialist Position and relating to the negative appraisals of her in 1996 in her IDHR claim, those claims are barred.

In determining whether a claim is barred because the claim has not been included in the administrative agency charge, the court looks to a number of factors.  The concern is whether the

investigating agency, here the IDHR, had enough information to investigate Blount's case and whether Searle was on notice of the charge. *See Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994).

In this case, the Validation Specialist Position claims as well as the complaints about Blount's negative appraisals are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins. Inc.,* 538 F.2d 164, 167 (7th Cir. 1976). In her IDHR charge, Blount complains that "[a]fter 27 years of employment, this was the first time that I had been . . . told that my work was unacceptable. Only after filing two charges of discrimination did the company determine that my work was no longer acceptable." Pl. 12(N) App. Tab 52. It is likely that claims relating to negative performance appraisals could "grow out of" this charge.

Furthermore, Searle was on notice of, at least, the claims relating to the Validation Specialist Position because very similar allegations were made by Gibbs and Pompey-Wright. Therefore, the claims are not barred. The Validation Specialist Position claims are discussed *infra.*

Blount alleges that she was discriminated and retaliated against in not being hired for and in being discouraged from applying for the CRA position. First, Blount's claims fail because she never applied for the CRA position. Def. 56.1(a)(Blount) ¶¶ 121, 130. In order to apply for a posted position, Searle's Job

Posting Policy No. 215 states that employees are responsible for "respond[ing] to the Job Posting by completing an Internal Job Application and submitting with resume, if required, to designated Human Resources representative during the posting period." Def. 56.1(a)(Blount) Tab 23, see Ghosh v. Indiana Dept. of Environmental Management, 192 F.3d 1087, 1091 (7th Cir. 1999) (Second element of prima facie case of failure-to-promote is that plaintiff "applied for and was qualified for the position sought.").

"The prima facie case, however, is a flexible standard that 'is not intended to be rigidly' applied." Collier v. Budd Co., 66 F.3d 886, 890 (7th Cir. 1995) (internal citation omitted). Blount alleges that she was discriminatorily discouraged from applying for the CRA position. "The far-ranging effects of subtle discriminatory practices have not escaped the scrutiny of the federal courts, which have provided relief from practices designed to discourage job applications from minority-group members." International Brotherhood of Teamsters v. United States, et al., 431 U.S. 324, 366 n. 51 (1977).

However, Blount's testimony is inconsistent as to how she was discouraged from applying. In her deposition, Blount testified that in October or November 1996, Kuss only told her, after a meeting, that he needed someone for the CRA position who could write protocol. Specifically, Blount was asked, "And what did he say to you at that time?" She responded, "He said that he needed

someone that could write protocols right away because we have a lot of protocols to write." When questioned "did he say anything else to you in that meeting?" Blount responded, "Not that I recall." Blount Dep. at 209.

Additionally in response to Searle's 56.1(a) Statement, Blount states, "when Blount went to talk to the hiring manager, Mr. Kuss about the job, he told her that he wanted to hire someone that could write protocols right away. This lead [sic.] to a clear inference that Blount would not be hired for the position." Pl. Resp. to Def. 56.1(a)(Blount) ¶ 119.

However, in a later affidavit, Blount alleges, "I spoke to Mike Kuss and asked him to consider me for the position of CRA. He said no because he needed someone who had experience writing protocols and could start writing protocols 'from day one' because we had a lot of new studies coming and he did not have time to train anyone." Blount Aff. ¶ 7. This Affidavit was filed March 3, 2000. Blount argues that summary judgment is inappropriate because she was turned away from a job which was, in turn, given to her white coworker. However, the March 3 affidavit is the first time that Blount alleges that Kuss actually told her not to apply rather than her "clear inference" that if she applied she would not be hired. Yet by March 3, 2000, she apparently had. In Zirpoli's situation *supra.*, Zirpoli clarified who said what; however, in Blount's situation, she actually changed what Kuss allegedly said to her. Based on the inconsistency within even her own testimony,

Blount does not provide sufficient evidence to allow a reasonable juror to find that Kuss told her not to apply for the job or prevented her from applying. *See, e.g., Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999) (a party may not avoid summary judgment by contradicting her prior deposition testimony with a later affidavit).

Furthermore, to the extent that Kuss told Blount that he needed someone who could write protocol, by the time that the position was posted, there was no requirement listed for the ability to write protocol, nor did the position description require protocol writing. Def. 56.1(a)(Blount) ¶ 122, Pl. App. Tab 17. The position was posted twice. The CRA position required a B.S. in a scientific discipline or a nursing degree or equivalent research experience. *Id.* Dunnahoo had a laboratory and clinical background through her work at the National Health Laboratories, Inc. and with Drs. Ware, Hurt and Goldstein. She was a certified physician's assistant, and therefore had extensive knowledge of clinical medicine and procedure. She also held two Bachelors of Science degrees, a B.S. in Biology and a B.S. in Health Care Sciences. She worked directly with the Clinical Department on ongoing projects and would have required very little training due to her familiarity with these projects. *Id.* ¶ 128. Blount has a degree in Education, not a Bachelor of Science. Blount did not have clinical experience.

Blount suggests that she overhead Kuss say, while he was talking to Dunnahoo, that CRO's do not like to work with blacks. Pl. Resp. to Def 56.1(a)(Blount) ¶ 119. First, Blount has no time frame for this conversation; therefore, it cannot be assumed that race was a consideration in the decision to promote Dunnahoo. Blount Dep. at 210, *see Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 724 (7th Cir. 1998) (remarks that are not temporally related to the employment decision were not direct evidence of discrimination).

Second, there were other decision makers, in addition to Kuss, who contributed to the decision to promote Dunnahoo. The candidates were interviewed by three independent interviewers and Dr. Bocanegra, the Executive Director of the Clinical Department. Def. 56.1(a)(Blount) ¶ 126. Finally, Searle has presented Dunnahoo's credentials and the legitimate reasons for choosing her for the CRA position, including Dunnahoo's educational and employment experience. *Id.* ¶ 128. "In demonstrating pretext, a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation." *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368 (7th Cir. 1998). Blount has not established that the reasons are pretextual.

Third, according to Blount, Kuss stated that *CROs* don't like to work with blacks, not that *he* doesn't like to work with blacks.

In *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997), the Seventh Circuit held,

> [t]here is only one situation in which the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job. That is where the subordinate, by concealing relevant information from the decision making employee of feeding false information to him, is able to influence the decision.

In this case, the CROs, which are Contract Research Organizations, are neither subordinates nor coequals and Blount presents no evidence that their opinion influenced the CRA decision. *See, e.g.*, Def. 56.1(a)(Blount) ¶ 52.

Blount alleges that she was discriminated and retaliated against during the Intensive Development Program, during the Performance Improvement Plan, and by her termination. She argues that she has both direct and indirect evidence of Searle's unlawful employment activities. "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, No. 99-536, 2000 WL 1743663, *12 (U.S. June 12, 2000)

The court addresses the alleged direct evidence first. "[B]y definition, direct evidence, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle*, 876 F.2d at 569. Similar to Gibbs' allegations, Blount alleges that she was targeted because of her discrimination charges and that Jacobs sought to build a case

- 38 -

to justify firing her.  In making this allegation, Blount presents the testimony of Zirpoli.

As to Gibbs, Zirpoli testified that Jacobs was targeting Gibbs for being a "ringleader."  As to Blount, Zirpoli only testified that, at best, Jacobs was targeting the "poor performers" that she had allegedly listed.  Pl. Appendix to 56.1(b), Tab 3, Zirpoli Aff. ¶2.  There is no direct evidence that Jacobs was discriminating or retaliating against Blount because she had engaged in statutorily protected speech without presuming that "poor performance" equals retaliation for filing discrimination charges.  Without presuming or inferring otherwise, poor performance is just poor performance as to Blount, even if Blount could persuade the jury that the conversation actually took place.  *Randle* 876 F.2d at 569.

Next, the court addresses Blount's indirect evidence of discrimination and retaliation surrounding the events leading up to and including her termination.  Searle asserts that it had legitimate nondiscriminatory reasons for giving and relying on negative appraisals of Blount, enrolling her in a Performance Plan and ultimately terminating her.

Specifically, Blount's direct supervisor documented inadequacies in Blount's performance.  Blount had difficulties taking a bid from a CRO and assessing whether it was a reasonable bid for the work that was being outsourced.  Pl. Resp. to Def. 56.1(a)(Blount) ¶ 188.  Blount's direct supervisor, Pocrnich, discussed problems with Blount about her performance throughout

1997. *Id.* ¶ 191. Pocrnich received a verbal complaint from Susan Rush regarding Blount's poor turnaround time for Case Report Forms ("CRFs"). Pocrnich discovered that Blount was not reviewing the coding reports appropriately, completely or at all. *Id.* ¶ 197. Both Kuss and Pocrnich identified that Blount had problems interacting with CROs. Blount did not go to the database to determine the progress of many of her studies. *Id.* ¶ 202. Pocrnich received verbal complaints from CROs at SCIREX. *Id.* ¶¶ 204, 205. Blount failed to take precautions during a rollover in patients; she was not prepared for meetings with CROs; she did not follow up on an outstanding query; she missed deadlines; and she had problems with consistency checks. *Id.* ¶¶ 206, 207, 209, 210, 211.

Third-parties documented problems with Blount's work. Melissa Cahill found that Blount needed improvement in several areas. *Id.* ¶ 220. Blount agreed with some of Cahill's assessments. *Id.* ¶ 221. Susan Kuss prepared three third-party evaluations and found that Blount needed improvement. *Id.* ¶ 234. Pocrnich determined that Blount could not perform in the DMA position and that Searle needed a DMA who could perform at a higher level than Blount. *Id.* ¶ 238.

To more fully quote the Seventh Circuit in *Stewart*, 207 F.3d at 387, "[t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that

reexamines an entity's business decision and reviews the propriety of the decision. Our only concern is whether the legitimate reason provided by the employer is in fact the true one."

In response to almost all of the documented problems with Blount's performance, Blount denies the evidence on the basis that it is tainted because she was targeted for termination. According to the Supreme Court,

> an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory, reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reasons was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves* at *8. The taint allegedly comes from Zirpoli's testimony about Jacobs' "true motives." However, Zirpoli's testimony would not lead a reasonable trier of fact to conclude that Searle's stated reasons are untrue. On the contrary, Zirpoli's affidavit reinforces Searle's cited reasons that Jacobs was, at worst, targeting poor performers. "Even if the reasons for [Blount's termination] were mistaken, ill considered or foolish, so long as [Searle] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

Therefore, the motion for summary judgment against Blount is granted.

## MOTION FOR SUMMARY JUDGMENT AGAINST LESLIE POMPEY-WRIGHT

### BACKGROUND

Pompey-Wright is African-American; she began her employment with Searle on March 17, 1986. Pompey-Wright does not have a college degree; she does not have computer programming skills. Pompey-Wright started at Searle as an Administrative Secretary. Her initial salary was $17,000. In February 1988, Pompey-Wright accepted a position as a Computer Graphics Designer/Operator in the Clinical Data Management Department. In May 1989, she accepted a position as a Clinical Data Monitor in the same department. On April 1, 1992, Searle avers that Pompey-Wright was promoted to the position of Senior Clinical Data Monitor and her duties included assisting in the data entry of Drug Experience Reports ("DERs"). Pompey-Wright avers that this promotion put her in the dual position of Senior Clinical Data Monitor and DER Coordinator. Her job grade level increased from a 9004 to 9006. This position did not include computer programming.

Pompey-Wright worked within the Clinical Data Management Department at the Research and Development ("R&D") facility from February 1988 to August 1996. Lucas-Mudd was Pompey-Wright's immediate supervisor. Pompey-Wright contends that she was also a supervisor in the Clinical Data Management Department.

Pompey-Wright's job as Senior Data Monitor evolved between 1992 and 1995 so that by 1995 she devoted approximately 70 percent of her time processing DERs. The Senior Clinical Data Monitor job

description did not accurately reflect the work that Pompey-Wright was performing in 1995. Searle alleges that Lucas-Mudd asked Pompey-Wright to begin to oversee the activities of Eck. Pompey-Wright contends that on March 9, 1995, Lucas-Mudd asked Pompey-Wright if she wanted to be supervise Eck and assume full time responsibility for the dictionaries.

Searle and Pompey-Wright dispute the title that Pompey-Wright held from March/April 1995 through August 1996. Pompey-Wright also supervised a temporary employee during this time. While Pompey-Wright supervised Eck, Pompey-Wright continued to devote approximately 70 percent of her time to DERs. No one else in Clinical Data Management had the same job responsibilities as Pompey-Wright because she was the only employee who was responsible for DER entry and overseeing another employee responsible for dictionary upkeep.

Included in Pompey-Wright's claims is failure-to-promote because of the failure to implement the reevaluation of her position. Pompey-Wright testified that Lucas-Mudd told her that Pompey-Wright could change her title before she left and that she would do what she could regarding the others' promotions. Pompey-Wright Dep. at 197. Searle contends that the correct term is "re-evaluation," not promotion (see Gibbs discussion, *supra.*).

On April 23, 1996, Kuse-Hamilton recommended to Swabb and Archambault that two Clinical Data Monitors be promoted to Senior Clinical Data Monitor positions: Louise Cole (white) and Penny

Cleveland-Scott (African-American). The promotions did not involve position reevaluations, and Kuse-Hamilton had been supervising Cole and Cleveland-Scott before being appointed Acting Head of Clinical Data Management. Kuse-Hamilton also noted in her recommendation, which was in the form of an e-mail, "There are some other personnel issues of this type that are now in my hands but will wait a little while since they entail reevaluations and new position descriptions." Cole and Cleveland-Scott were not promoted until September 1996, after the redesign was implemented.

Archambault resigned in April 1996. Swabb retained Palanjian in May 1996 to assume Archambault's former responsibility for running SCDM. Palanjian recommended that the reevaluations be put on hold until the redesign was determined; no date is specified as to when this recommendation took place. Palanjian told Gibbs that the reevaluations were not going to happen. The paperwork for Pompey-Wright's, Eck's, Gibbs', and Friedman's proposed job changes was never signed off on by Kuse-Hamilton or Archambault and was never submitted to anyone in Human Resources.

Searle does not have a policy that an employee who supervises the activities of another employee should be given a particular job title or salary level. Supervisors at Searle have different grade levels. Pompey-Wright and Friedman's upgrades to 9008 did not occur. Pompey-Wright alleges that Eck was upgraded in 1997 to 9004. Pl. Resp. to Def. 56.1(a)(Pompey-Wright) ¶ 68, Def. Tab 57.

In August 1996, upon the redesign of SCDM and the recommendation of Palanjian, Pompey-Wright was transferred from Clinical Data Management to Clinical Safety, where she was to report to Dr. Robert Herting, the Director of Clinical Safety. Her position was Clinical Research Associate, R&D Clinical Safety. Both parties agree that Pompey-Wright was moved to Clinical Safety because her responsibility for entering DERs was a safety-related function, and she already had been working closely with members of the Clinical Safety Department. Pompey-Wright received salary increases in 1997 and 1998; her salary was $53,000 per year. On May 22, 1996, Pompey-Wright filed a Charge of Discrimination.

## DISCUSSION - POMPEY-WRIGHT

Pompey-Wright has not alleged that she has direct evidence of discrimination. The court addresses Pompey-Wright's claims under the *McDonnell-Douglas* burden-shifting framework. *See, e.g., Maarouf v. Walker Manufacturing Co.*, No. 99-1196, 2000 WL 369903 (7th Cir. Apr. 12, 2000). The court addresses Pompey-Wright's claim that she was discriminated against by Searle between March 1995 and August 1996 because her promotion was not processed, even though other white employees received promotions during this time. Pompey-Wright contends that she received a promotion from her then-immediate supervisor, Lucas-Mudd, and that Searle refused to process the promotion. Some of the facts in this claim overlap with Gibbs' failure-to-promote claim discussed *supra.*

Searle first disputes the use of the word "promote," arguing that in fact, Pompey-Wright was seeking a reevaluation of her position. Second, Searle argues that Lucas-Mudd did not have the authority to re-evaluate Pompey-Wright's position unilaterally.

According to Searle's stated policy,

- New Position
  A new position cannot be filled or recruited for until the position has been evaluated and a grade determined. The position description is prepared by the position's immediate supervisor and submitted to Human Resources with a brief explanation of the rationale for the new position. The next level of management must be notified that the action is being taken.

- Existing Position
  A position which has had significant change in job responsibilities should be reviewed for potential reclassification. A revised position description is prepared by the supervisor and submitted to Compensation Administration with a brief statement of the changes in the position. The next level of management must be informed of the request for reclassification. The incumbent in the position should not be informed of the request.

Def. 56.1(a)(Pompey-Wright) ¶ 30.

Pompey-Wright argues that Lucas-Mudd's May 15, 1995 memo was an announcement of her promotion. Lucas-Mudd stated "The Dictionary and DER functions have been combined into one group, consisting of Leslie Pompey-Wright and Lisa Eck. Leslie now reports into me and Lisa into Leslie." Pl. 56.1(b) App. Tab 37. Furthermore, Pompey-Wright argues that because Lucas-Mudd asked her as well as Friedman, Gibbs and Eck to rewrite their positions and

submit the reevaluations in January 1996, Pompey-Wright had effectively been promoted. However, the above-quoted policy clearly sets forth that the process of reevaluation entails not only the immediate supervisor but also the "next level of management" and "Human Resources" or "Compensation Administration." Def. 56.1(a)(Pompey-Wright) ¶ 30. Lucas-Mudd did not promote Pompey-Wright unilaterally.

Nevertheless, Pompey-Wright alleges that the failure to process her reevaluation was discriminatory as well. Searle argues that similarly situated, white employees' reevaluations were also not implemented. Pompey-Wright, Gibbs, Friedman and Lange all submitted reevaluations to Lucas-Mudd, per Lucas-Mudd's request. Not only Pompey-Wright's but also Friedman's and Eck's were not approved during this time period. In fact, only Gibbs received a grade level promotion and Gibbs' promotion did not occur until August 1996.

Pompey-Wright counters that she is not similarly situated to Friedman or Eck because she is the only one whose responsibilities increased and who was given supervisory authority. The court notes that Pompey-Wright's arguments put her in somewhat of an untenable position. On the one hand, she is arguing that unlike "[a]t least nine Caucasian employees," her promotion was never processed. Compl. ¶ 61. On the other hand, she argues that she cannot be compared to the other employees who were seeking job reevaluations

because she was the "only employee at Searle/Monsanto in her specific position." Pl. Resp. at 33.

Even assuming that Friedman and Eck are not the relevant pool of employees to compare Pompey-Wright to, Searle produces evidence of other employees placed in supervisory positions, whose positions were not re-evaluated and who were not given a job upgrade. Pompey-Wright compares herself to Kuse-Hamilton, who was upgraded in November 1995. However, Searle notes that Kuse-Hamilton received no pay increase or grade level increase when the number of employees reporting to her increased from 11 to 230 and her workload was significantly increased. Def. 56.1(a)(Pompey-Wright) ¶ 51, 52. Friedman supervised five employees and had the same job grade as Pompey-Wright, 9006. *Id.* ¶ 20. Even if no other employee at Searle was in Pompey-Wright's unique position, Pompey-Wright herself has received salary raises over the course of her employ with Searle from $17,000 to now more than $53,000. *Id.* ¶ 6, 75. Therefore, Pompey-Wright has not established a *prima facie* case of discrimination. The motion for summary judgment against Pompey-Wright is granted.

## MOTION FOR SUMMARY JUDGMENT AGAINST ROSE DANIELS

### BACKGROUND

Daniels is African-American, and she began working at Searle on September 30, 1970. Daniels filed a charge against Searle alleging age discrimination on November 18. 1996. She later amended her charge to include race discrimination.

- 48 -

To provide context to Daniels' claims, it is important to note that part of the redesign of SCDM Department, discussed *supra.* with Gibbs, sought to make the hierarchy "flatter" by creating the STAR Teams. Woods Dep. at 9-10. Therefore, supervisory positions were eliminated in 1995. In 1995, Daniels held the position of Supervisor, Clinical Data Monitors. Gruszka held the same position with the title of Supervisor, Data Management. As part of the redesign within data management, Lucas-Mudd removed two supervisory positions, Daniels' and Gruszka's, and replaced them with one manager position.

The parties dispute the timing, but Lucas-Mudd informed Daniels and Gruszka that their supervisory positions would be eliminated and that they would be data monitors on a STAR Team. Effective November 16, 1995, Daniels supervisory position was eliminated and she was assigned to a non-manager role on a STAR Team. Daniels asserts that she believed that being removed from a managerial position was temporary. Gruszka was also placed in a non-managerial position on a STAR Team; Gruszka left Searle in October 1995.

When Daniels left her supervisory position in November 1995, her salary was $62,000. According to Lucas-Mudd, the elimination of Daniels' position was not a demotion. In fact, Daniels' pay level remained the same. Daniels filed her first charge with the IDHR on November 18, 1996, 368 days after her supervisory position was eliminated on November 16, 1995. Def. 56.1(a)(Blount) App.

Tab 124. Daniels completed the IDHR questionnaire on October 23, 1996, 342 days after her supervisory position was eliminated. Daniels admits that her attorney, Joanne Kinoy, stipulated at the fact-finding conference in 1997 that the date Daniels was reassigned from a managerial position to a non-managerial position was August 1995. In her 1996 Performance Appraisal, which she prepared in January 1997, Daniels admitted that "the position held as Supervisor of Clinical Data Monitors from 1984 was eliminated in November 1995." Def. 56.1(a)(Blount) App. Tab 121.

On September 12, 1995, the position of Manager, Clinical Data Management was posted. Kuse-Hamilton and Jacobs applied. According to Blount, she applied as well. Blount Aff. ¶ 8. Lucas-Mudd informed Daniels about the position, but Daniels never applied. Daniels adds that she was not qualified for the position based on the posting. According to Lucas-Mudd, Kuse-Hamilton was selected because she had excellent technical background, she had managed people who had set up databases, she had substantial knowledge of clinical data, and she had superior knowledge of a new database called the "DLB Recorder." Kuse-Hamilton Aff. Daniels was not using a DLB Recorder.

Also, in November 1995, Kuse-Hamilton became Daniels' manager. As such, Kuse-Hamilton was supervising employees that Daniels had supervised in the past.

In October or November 1996, Kuse-Hamilton asked Swabb if she could concentrate on the Cardiovascular area. Kuse-Hamilton was

transferred from the Arthritis Franchise and Temporary Acting Head of the Data Monitor Group to the position of Manager of Cardiovascular. Else Barin ("Barin") temporarily replaced Kuse-Hamilton as Acting Head of the Data Monitor Group.

After receiving a charge of discrimination, on December 10, 1996, Muehrcke told Daniels that he did not know that she had been interested in a managerial position. Muehrcke then told either Swabb or an employee below Swabb, who was in charge of openings in management, that Daniels was interested in a supervisory position. On December 18, 1996, Swabb met with Elsa Barin about Daniels because Daniels had expressed an interest in the position of Group Leader, Arthritis. At the meeting, Barin showed Swabb a note from Kuse-Hamilton which said that Daniels had not performed exceptionally that year. Swabb and Barin decided to defer any consideration of Daniels for a group leader position until Kuse-Hamilton gave further feedback on Daniels' performance for 1996 in her end-of-year performance review. Swabb opined to Muehrcke that there were no appropriate positions at that time that Daniels was well qualified for. Muehrcke relayed to Daniels that there were no opportunities for her.

In March 1997, Pocrnich laterally transferred from Lorex and assumed the position as Group Leader, Arthritis. Lorex was a joint venture with Searle and Synthelabo, a French company. In March 1997, Lorex downsized from 75 employees to 10. It was Searle's practice to place a person from another related company rather than

terminate them. Searle asserts that because Pocrnich was a displaced employee, the job that she received was not posted. Daniels believed that she was better qualified than Pocrnich to hold the position of Group Leader, Arthritis.

## DISCUSSION - DANIELS

In the Complaint, Daniels alleges that Searle discriminated against her on the basis of race and age because she was removed from her supervisory position and assigned to a non-managerial role on a STAR Team, because she was not awarded a supervisory position when the redesign was completed in August/September 1996, because Kuse-Hamilton was assigned to the position of Manager of Arthritis Franchise and the position was never posted, and because in March 1997, the position that Pocrnich assumed was never posted and Daniels had told Muehrcke that she was interested in supervisory positions such as Pocrnich's.

First, Daniels is not proceeding on her claim of discrimination based on age. Therefore, Daniels' age discrimination claims are dismissed.

Searle argues that Daniels' claim relating to the November 1995 elimination of her position is time-barred because she filed her charge with the IDHR more than 300 days later. In that Daniels responds, "Daniels' charge is timely as to the failure to place her in a supervisory position in August 1996 and thereafter," Daniels has constructively abandoned her argument that she was discriminated against in November 1995 when her position was

eliminated during the redesign: "Daniels' charge is timely as to the failure to place her in a supervisory position in August 1996 and thereafter." Pl. Resp. at 38, see *Sanders v. Village of Dixmoor*, 178 F.3d 869, 870 (7th Cir. 1999) (claims not presented in response to motion for summary judgment are waived). This is not a discriminatory demotion claim and if it is, it is dispelled by the fact that Gruszka, a white man in the same position as Daniels, was also "demoted."

The court addresses Daniels' arguments that she was not placed where she thought she should be. The court therefore proceeds to consider Daniels' claim that Searle discriminated against her by failing to place her in a supervisory position after the redesign was implemented in August 1996. Daniels' claim includes both Kuse-Hamilton's promotion and Pocrnich's placement. Searle contends that the failure to promote Daniels to Manager of the Arthritis Franchise in March 1997, when Pocrnich was promoted, is beyond the scope of the charge. However, in that Daniels alleged that similarly situated employees were promoted to managerial positions, it is fair to say that Searle was on notice that this charge included not only the decision to promote Kuse-Hamilton to Manager but also to promote Pocrnich in March 1997. *Cheek* 31 F.3d at 500. In her March 6, 1997 charge, as part of her *prima facie* allegations, Daniels alleges, "I am well qualified for the position of manager of arthritis franchises." Def. 56. 1(a)(Daniels) App. Tab 31.

Daniels clarifies that she "never asserted that she should hold Kuse-Hamilton's position as Acting Head of Data Management. Daniels does contend that she has equal or superior qualifications to Pocrnich." Pl. Resp. at 38. However, Daniels has failed to establish prong four of the *prima facie* case; she has failed to show that Pocrnich was similarly situated to her. Title VII does not require employers to hire minorities over more qualified, non-minority employees, even if the minority is qualified. "No rational enterprise that has several qualified candidates for a position selects among them by lot: it picks the best qualified." *Mason v. Continental Illinois Nat'l. Bank*, 704 F.2d 361, 364 (7th Cir. 1983).

In this case, Daniels had supervisory experience; her job performance exceeded expectations; she worked with clinical people on the third floor; she had interactions with CROs and she was willing to help and be a team player. However, Pocrnich not only had supervisory experience, she had experience managing her own studies; she has a Bachelor of Science Degree in Business from Northwestern University and an Masters in Business Administration from Lake Forest Graduate School of Management; she had taken continuing education computer courses while at Lorex, including courses in SQL Plus and RELATE; she was trained in SQLAssist and DLB Recorder; she went to a management seminar by the American Management Association and a seminar by the Drug Information Association; in 1995 she was promoted to Manager, Research Data

Systems; and the Data Entry Department, Medical Data Coordinator Department, application, programming and project coordination functions all reported to her.

Daniels has not established that she is similarly situated to Pocrnich:

> when the opening involves a managerial position for which there are several applicants, the employer will naturally be looking for the best qualified applicant rather than a minimally qualified one, and the fact that he turns down the first minimally qualified applicant who shows up, in the hope that a better qualified one will appear soon, does not create an inference of discrimination.

*Mason* 704 F.2d at 364. Additionally, Kuse-Hamilton, Daniels' previous supervisor, noted that Daniels' performance had not been exceptional after she moved to the STAR Team Data Monitor position. *See* Def. 56.1(a)(Daniels) App. Tab 34. Therefore, Daniels has failed to establish a *prima facie* case of discrimination; the motion for summary judgment as to Daniels is granted.

## VALIDATION SPECIALIST POSITION

Gibbs, Blount and Pompey-Wright allege that they were discriminated against by Searle's handling of the Validation Specialist Position.

## BACKGROUND

In March 1996, Karen Lange, the employee in the Clinical Data Management Department who was partially responsible for the validation of computer databases, resigned. A new position, "Validation Specialist," was approved. A white woman, Charmaine Pisula ("Pisula"), was chosen to attend a validation training

program.  Pisula, Stanton Alleyne (African-American), and Penny Scott-Cleveland (African-American) had expressed an interest in attending the training program. Before the job was even posted, Pisula was given an opportunity to interview for the position.  The Human Resources Department received complaints about the preferential treatment of Pisula.

When the Validation Specialist Position was finally posted, seven people applied, five African-Americans and two whites.  The applicants included plaintiffs Gibbs, Blount and Pompey-Wright. After the interviewing was concluded, both of the white candidates were ranked higher than the African-American candidates.  The interviewers determined that Pisula was the most qualified candidate for the position.  Def. 56.1(a)(Pompey-Wright) ¶ 69.

Upon recommendation from Palanjian, the position was lowered from a Grade 7 to a Grade 6, without a change in the job description or stated requirements.  E-mails sent between Muehrcke and Swabb stated that Searle hoped to "take the heat off of the position."  After the grade change, the applicants were asked whether they still wanted to be considered for the job.  However, Searle eventually withdrew the Validation Specialist Position.  The e-mail message distributed to the applicants stated, "the selection of a candidate for the position of Validation Specialist has been placed on hold due to the current evaluation of SCDM structure in progress."  Def. 56.1(a)(Gibbs) ¶ 77.  Therefore, no one was placed in the position.

## DISCUSSION - VALIDATION SPECIALIST POSITION

"Plaintiffs Gibbs, Blount and Pompey-Wright contend that they were denied fair opportunity to be promoted to the position of Validation Specialist Position in 1996 on the basis of their race in violation of Title VII of the Civil Rights Act." Pl. Resp. at 22. First, the court finds that the plaintiffs did not suffer adverse employment action with regards to this claim. In *Locke v. Gas Research Institute*, 935 F.Supp. 994, 1001 (N.D. Ill. 1996), the court granted summary judgment for an employer when plaintiff alleged failure-to-promote and the employer withdrew and never filled the position. In this case, Searle withdrew the position. No one was promoted to the Validation Specialist Position.

Nevertheless, the court also addresses the arguments that Gibbs, Blount and Pompey-Wright suffered disparate treatment in light of Pisula's opportunity to attend a training seminar and pre-interview for the position. First, Searle avers that Pisula expressed interest in becoming a Clinical Systems Administrator. The training course was a Validation of Computer Systems Training Course. Def. 56.1(a)(Gibbs) ¶ 63. Gibbs, Blount and Pompey-Wright did not express a similar interest. Even though Scott-Cleveland and Alleyne also expressed an interest in attending, neither Scott-Cleveland nor Alleyne are plaintiffs to this suit.

Anecdotal evidence "can only be collateral to evidence of specific discrimination against the actual plaintiff." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) (quoting

*Williams v. Boorstin*, 663 F.2d 109, 115 n. 38 (D.C. Cir. 1980)). In this case, the collateral effect is limited by the fact that the training program offered Pisula little advantage; she was never given the job. Furthermore, the plaintiffs do not assert any other advantage the training program offered Pisula.

Second, all of the interested candidates were given the opportunity to interview for the position. Def. 56.1(a) ¶ 68. Again, the plaintiffs have not alleged how a pre-posting interview nor the training course were adverse to their employment. Pl. Resp. to Def. 56.1(a) ¶ 68, *see also* Local Rule 56.1(b)(3)(A). The plaintiffs have not met their burden of showing that they suffered an adverse employment action. In *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000), the plaintiff's allegations that the employer preselected and groomed white women for promotions failed because they were alleged "without supporting facts or explanatory details." Therefore, summary judgment is granted as to Gibbs', Blount's and Pompey-Wright's Validation Specialist Position claims.

## PLAINTIFFS' STATISTICAL EVIDENCE

This is a disparate treatment case: the plaintiffs pray that this court find that Searle "intentionally violated Title VII of the Civil Rights Act of 1964." Compl. ¶ 33a. Included in each of the plaintiffs' allegations is a paragraph which reads,

> As a result of "redesign" and other conduct at issue in this lawsuit, there are no longer any African-American supervisors in SCDM and the overall percentage of

African-American employees has been reduced. Since 1996 approximately 23 individuals have been hired to work in this department. On information and belief only 2 of the 23 are African-American.

Compl. ¶¶ 25, 49, 65, 81. The plaintiffs cite to similar alleged statistical anomalies in their opposition brief, specifically listing EEO data. Pl. 12 N ¶ 133. The plaintiffs also list, as a material fact, a diversity study that Searle sponsored. Pl. 12N ¶ 82. The court addresses the admissibility of the evidence, the significance of this data as evidence that Searle's legitimate nondiscriminatory reasons are pretext and whether it raises an issue of material fact as to Searle's discriminatory conduct and/or intent.

The court first addresses the relevance of the statistical information. According to the Seventh Circuit, "[s]tatistical evidence is of more limited relevance in cases of individual disparate treatment than it is in class actions and disparate impact cases. In conjunction with other evidence of disparate treatment, however, statistics can be probative of whether the alleged disparity is the result of discrimination." *Kidd III v. Illinois State Police*, 167 F.3d 1084, 1102 (7th Cir. 1999). In deciding how much emphasis to place on the numbers, the Seventh Circuit has said that, "[t]he district court is far better situated than we to gauge the significance of these statistics in the context of all the other evidence presented to the court. The court may take them for what they are worth." *Id.*

The plaintiffs quote EEO figures which reflect that between approximately 4-8% of Searle's hiring for Research and Development were African-Americans. Furthermore, the plaintiffs state that "[b]etween the fall of 1995 and February 1998, the number of black supervisors in data management was reduced from three to none and two of the four black data monitors were removed from their positions and replaced with non-black employees." This evidence does not change the above rulings for the following reasons.

The Seventh Circuit has said that straight percentage comparisons are not statistically significant. *King v. General Electric Co.*, 960 F.2d 617, 627 (7th Cir. 1992). The statistics fail to compare the number of qualified white and African-Americans both in the general population and those who applied and were rejected, and the Seventh Circuit has held that it is important that "the statistical analysis properly controls for factors that might lead to differences in raw percentages." *Id., see also EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 324, n. 22 (7th Cir. 1988) ("Multiple regression analyses, designed to determine the effect of several independent variables on a dependent variable, which in this case is hiring, are an accepted and common method of proving disparate treatment claims.").

The court next addresses the results of the diversity study. The parties do not dispute that Searle paid for a diversity study which was conducted by Simmons and Associates. After the survey results were released, Searle provided diversity training and

instituted the code of conduct. Pl. 12N ¶¶ 75, 76. The plaintiffs only submit two pages of the survey. Pl. 12N App. Tab 38.

According to the plaintiffs, all of the employees within the SCDM were asked to complete a questionnaire voluntarily. The plaintiffs quote several areas in which the study found reason for "severe concern," including that employees felt that if they complained about unfair treatment, they would be retaliated against and that the employees felt that there were problems with race relations at Searle.

The diversity study does not change the above results granting all but one of Searle's motions for summary judgment for the following reasons. Even if admissible under a hearsay exception, say for example as a mental impression, the truth of this survey is only that anonymous, self-selected employees in the SCDM felt that they were being discriminated against. FRE 803(3). It provides no insight into the intentions of the decision makers. *See Parkins* 163 F.3d at 1032.

## CONCLUSION

Therefore, for the foregoing reasons, Searle's Motions for Summary Judgment against Blount (Document #25), Pompey-Wright (Document #24), and Daniels (Document #26) are GRANTED. The Motion for Summary Judgment against Gibbs (Document #27) is GRANTED IN PART AND DENIED IN PART. Gibbs' claims of retaliation following January 1997 remain.

Additionally the court finds as follows:

1.    Plaintiffs' Motion for Leave to File Combined Response Brief (Document # 41-1) is granted;

2.    Plaintiffs' Motion to File 56.1 Statements in Excess of 15 Pages (Document # 41-2) is granted;

3.    Plaintiffs' Motion for an Order Directing that Documents be Restricted (Document # 65) is granted; and

4.    Plaintiffs' Motion to Strike Portions of the Swabb Affidavit and the Lucas-Mudd Affidavit submitted by the defendant in support of its motions for summary judgment (Document #66) is denied as moot.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: July 10, 2000